### In re FROEHLICH RUBBER REFINING CO.

(District Court, E. D. Pennsylvania. June 12, 1905.)

#### No. 1,857.

BANKRUPTCY—RECLAMATION OF PROPERTY BY SELLER—CONSTRUCTION OF CONTRACT.

Certain electric motors were at different times delivered by petitioner to the bankrupt, a manufacturing company, under contracts providing that they should be used on trial for two months; that, if unsatisfactory for the purpose contracted for, they should be returned within five days thereafter and a sum paid for their rental; that, if satisfactory, they should be purchased by the company and paid for within stated times thereafter. All the motors remained in possession of the company until after the institution of the bankruptcy proceedings, and passed into possession of its receiver; no offer to return them, nor demand for their return, having been made. As to some, the time for their return had expired, as well as the time within which payment was to have been made, and bills for the price had been rendered by petitioner, but had not been paid. As to others, the time for trial had not expired when the bankruptcy intervened and demand for their return was made. Held, that title to the machines did not pass on their delivery under the contracts, but that it vested in the bankrupt when the time for their return expired, the failure to return them being an election to purchase which was acquiesced in by petitioner, and that it was entitled to recover possession only of those machines as to which such time for election had not expired.

In Bankruptcy. On certificate from referee.

The following are the opinion, findings, and order of Referee in Bankruptcy D. W. Amram:

The Froehlich Rubber Refining Company was adjudicated a bankrupt on March 4, 1904, upon creditors' petition filed against it on January 23, 1904. At the time of the filing of the petition in bankruptcy the bankrupt was in possession, inter alia, of the following articles: One electric motor of 75 horse power; one electric motor of 20 horse power; two electric motors of 5 horse power each; electric wiring for all of the said motors; five automatic

starters attached to the said motors; seven transformers; seven electric meters. On February 17, 1904, the Manufacturers' Electric Company filed its petition in the District Court, alleging that the said above-described articles were the property of the petitioner, and not the property of the bankrupt, that the petitioner had received notice that this property, was to be sold on February 18, 1904, and that demand had been made on the receiver for the delivery of this property, but the receiver had failed to consent to the delivery of the said property to the petitioner. Wherefore the petitioner prayed for an order to restrain the receiver from selling or offering for sale the property above described. On February 17, 1904, the court entered an order, upon consideration of the foregoing petition, that the receiver "deliver the several articles particularly mentioned in the said petition to the said Manufacturers' Electric Company, upon the entering of security by said Manufacturers' Electric Company for the value of said articles, conditioned to abide further order of the court with reference to the title to said property"; and the court further ordered "that the said petition be referred to the referee to whom this cause may hereafter be referred, to take testimony and examine into the facts alleged in said petition, and make such order as may be proper." On the same day, to wit, February 17, 1904, the Manufacturers' Electric Company delivered its bond for $5,000 to the receiver, conditioned that, "if the above-bounden the Manufacturers' Electric Company fail to maintain its title to the goods or chattels mentioned in the schedule hereto annexed, marked Exhibit A, and shall pay to the Equitable Trust Company, receiver as aforesaid, or to its successors, or to the trustee in bankruptcy of the estate of Froehlich Rubber Refining Company, bankrupt, if such trustee shall hereafter be appointed in the place and stead of the receiver, the value of said goods and chattels, then this obligation to be void and of no effect; otherwise, to be and remain in full force and virtue." The articles mentioned in Exhibit A are the articles above described. On the 8th day of June, 1904, the Philadelphia Electric Company filed a petition praying for rule on the trustee to show cause why the petitioner should not be permitted to intervene as claimant of title to the above-described property. This petition was referred to the referee in the cause "for his consideration and action thereon."

It was agreed by counsel representing the Manufacturers' Electric Company, the Philadelphia Electric Company, and the receiver and trustee in bankruptcy, that the title to the articles in question, if found to be in the Manufacturers' Electric Company, has passed to the Philadelphia Electric Company under an agreement dated December 5, 1903, between the said Manufacturers' Electric Company and Philadelphia Electric Company. Testimony was taken before the referee on behalf of the petitioner, as well as on behalf of the receiver and trustee in bankruptcy, from which it appears that the articles in question were delivered by the Manufacturers' Electric Company to the bankrupt under six several agreements, which were offered in evidence, marked, respectively, Exhibits A, B, C, D, E, and F.

I shall first consider the question of title to the 20 horse power motor. This motor was delivered by the Manufacturers' Electric Company to the bankrupt under a "contract and agreement" of which the following is a copy:

"The Manufacturers' Electric Company, American and Somerset Streets, Philadelphia, Pa.

"This contract and agreement, by and between the Manufacturers' Electric Company, of Philadelphia, hereinafter called 'the company,' and the Froehlich Rubber Refining Co., hereinafter called 'the consumer,' witnesseth: that the consumer has requested the company to supply electrical current for one motor of 20 H. P., at the premises, situated 3444 Trenton Ave.; and as the said consumer has not purchased said motor, but is desirous of having the use of the same for a period of one month—

"The consumer agrees: (1) To pay the cost of hauling of the motor to his premises. (2) To pay for the erection and interior connections to said motor, to the point where the service connection will be made, and the inspection of same by the Philadelphia Fire Underwriters' Association. (3) To use the motor for the purpose above set forth for a period of two calendar months from date current is turned on. (4) To purchase said motor, paying therefor

the sum of $548.95 within 30 days after expiration of 60 days trial, provided the motor proves satisfactory for the purpose contracted for. (5) To return the motor to the company in as good electrical and mechanical condition as when received, within 5 days after expiration, reasonable wear and tear excepted, provided said motor proves unsatisfactory for the purpose contracted for. (6) To pay for the use of the said motor during the two calendar months from date current is turned on the sum of $20.00, which includes clause 1 and 2, and for the current consumed during said period at the regular rates of the company. These payments to be made at the office of the Manufacturers' Electric Company, as above stated.

"And the company agrees, upon the purchase of said motor by the consumer, to credit the rental paid for said calendar month as part of the purchase money.

"In witness whereof, the respective parties have affixed their hands and seals this 10th day of September 1903.

"[Signed]   The Froehlich Rubber Refining Co.<br>
"[Signed]        Jesse Froehlich, Secy.

"Witness:
"[Signed]   H. H. Perkins.

"For Mfrs. Co.<br>
"[Signed]   H. H. Perkins.

"Exhibit B.
"4/27/04."

(It was agreed by counsel for the respective parties that, wherever in the printed agreement the words "one month" appeared, it should be read "two months.")

The ultimate purpose of this contract was to sell the 20 horse power motor to the bankrupt for the price of $548.95. For the purpose of enabling the bankrupt to determine whether or not it would buy the motor, it was agreed that the bankrupt could have the use of the motor on trial for 2 months, or 60 days, from the date that the current is turned on. If the motor was not purchased by the bankrupt, but returned to the Manufacturers' Electric Company, the bankrupt agreed to pay $20 for its use during these 2 calendar months, and for the cost of hauling the motor to the premises of the bankrupt, and the cost of erecting and connecting the motor on the said premises. If, however, the bankrupt purchased the motor, this charge of $20 was not to be paid, or, if paid, was to be credited on account of the purchase money. The bankrupt agreed that, if the motor proved "unsatisfactory for the purpose contracted for," it would return the motor within 5 days after expiration of the 60 days' trial, and further agreed that, if the motor proved "satisfactory for the purpose contracted for," it would purchase the said motor, paying therefor the sum of $548.95 within 30 days after the expiration of the 60 days' trial. The motor was delivered in accordance with this agreement, and the current turned on, on September 18, 1903. This motor supplied the power for running the elevator and certain machinery in the rubber goods factory of the bankrupts. It commenced operation on September 18, and was used until December 24, 1903. Between December 24, 1903, and January 23, 1904, the date of the filing of the petition in bankruptcy, the factory was practically at a standstill. It ran altogether only six days during that period. The 20 horse power motor was not used at all after December 24th. From the records of the Manufacturers' Electric Company it appears that from September 18th to December 24th this motor ran altogether 2,775 kilowatt hours, equivalent to 186 working hours.

Much testimony was taken for the purpose of proving whether or not the motor worked satisfactorily. The substance of all this testimony is that the motor was mechanically satisfactory, but, in view of the fact that it was furnishing 20 horse power for the purpose of running machinery which only required 13 horse power, it was not an economical appliance. There was also testimony that it ran too hot, and that its momentum was too great, both of which faults were apparently due to the fact that the motor supplied too much power for the work that it was doing, and that the unused power manifested itself in the excessive momentum and in heat. The 60 days' trial

expired on November 18, 1903, and, if the motor was unsatisfactory, it was the duty of the bankrupt under its contract to return it within 5 days thereafter, to wit, on or before November 23, 1903; but the bankrupt did not express any dissatisfaction with the motor, and kept the same and continued to use it until December 24th. According to the testimony of Mr. Russell, called on behalf of the Manufacturers' Electric Company, two of the officers of the bankrupt corporation complained to him that the motor was not running economically; but this complaint was made after December 10, 1903. The 30 days after the expiration of the perod of trial expired on December 18, 1903, and on or about December 29, 1903, the Manufacturers' Electric Company sent a bill to the bankrupt, charging it with the amount of the contract price of the motor. In January, 1904, the secretary and another representative of the Manufacturers' Electric Company called on Mr. Jesse Froehlich, vice president of the bankrupt corporation, and demanded payment for the motor, and also of the bills for the current supply to the motor between September 18th and December 24th, the latter amounting to $149.52, and stated that unless the bills were paid the current would be cut off at a certain date thereafter; and in fact the current was cut off on January 19, 1904, but the motor was permitted to remain in the possession of the bankrupt, and no effort was made on behalf of the Manufacturers' Electric Company to reclaim it until February 17, 1904, on the day before it was to be sold by the receiver in bankruptcy.

This evidence, together with other evidence in the case, satisfies me that the Manufacturers' Electric Company had no intention of retaining title to the motor, but considered that the motor had been sold to the bankrupt. At some time after it was discovered that the motor was not running economically, the agent of the Manufacturers' Electric Company suggested that his company would be willing to take back this 20 horse power motor and replace it by three smaller motors—a 7½ horse power motor for the elevator, a 3 horse power motor for the sewing machines, and a 3 or 4 horse power motor for the machines on the first floor; but no action was taken on his suggestion, and the motor remained in possession of the bankrupt as theretofore. The Manufacturers' Electric Company knew that the motor was not being used after December 24th, and that the bills for the current supply had not been paid, without taking any step to protect its alleged title to the motor, either by demanding its return or by taking it through proper legal proceedings; but this thought evidently did not occur to the Manufacturers' Electric Company, because it considered the motor sold, and it was interested only in securing the purchase price. If suit had been brought for the purchase money, a defense by the Froehlich Rubber Refining Company on the ground that the motor was not satisfactory would have proved unavailing, in view of the fact that it continued to keep the motor and had given no notice whatever of its unsatisfactoriness to the Manufacturers' Electric Company; and the same evidence which would have sufficed to sustain the claim of the Manufacturers' Electric Company for the purchase price of the motor now suffices to establish the title of the Froehlich Rubber Refining Company.

Evidence was introduced on behalf of the Manufacturers' Electric Company to the effect that at a meeting of the board of directors of the bankrupt on December 26, 1903, Jesse Froehlich, vice president of the bankrupt corporation, reported that the motors supplied were not satisfactory; but it appears that no action was taken by the board on this report, and it may seriously be questioned whether any action by the board at that time would have relieved it of its indebtedness. The reason for nonpayment of the bill for the motor and for the current supply sufficiently appears. The Froehlich Rubber Refining Company during the year 1903 found itself in financial difficulties. On December 24, 1903, it was obliged practically to close its factory, and an attempt was made to reorganize the corporation upon a sounder financial basis. On January 1, 1904, its balance in bank was about $400 or $500, and the money that subsequently was received by it was used to pay off creditors who were pressing for payment. The statement, made by Mr. Jesse Froelich at the meeting of the board of directors, to the effect that the motor was not satisfactory, may, in view of all the facts in the case, be readily explained as an attempt by him to offer some reason to his board of directors for the nonsuc-

cess of the business; for it cannot be denied that, if the motor had been really unsatisfactory in any serious sense, it would not have been permitted to remain on the premises of the bankrupt beyond the day on which that fact was discovered. The complaint which was made about the uneconomical running of the motor was not taken seriously by any one, either by the persons making it or by the Manufacturers' Electric Company.

The value of the motor on February 7, 1904, was $470.

It now becomes necessary to consider the nature of the agreement under which this motor was delivered to the bankrupt. It is an agreement for the transfer of property as a bailment, with the option on the part of the bailee to purchase it. The delivery of the property to the bankrupt was not such delivery as passed title. Goss Printing Press Co. v. Jordan, 171 Pa. 474, 32 Atl. 1031. It was necessary that the property should be placed on the premises occupied by the bankrupt, in order that the trial might be made, the satisfactory conclusion of which was a condition precedent to the determination on the part of the bankrupt as to whether or not it would exercise its option to purchase. Hence, during the 60 days in which the motor was in possession of the bankrupt on trial, the title to the motor was in the Manufacturers' Electric Company. At the expiration of the 60 days it became the duty of the bankrupt to determine whether it would exercise its option to purchase. Whether the motor was satisfactory or unsatisfactory was a fact to be determined by the bankrupt alone, and its decision was in no way controllable by the will of the Manufacturers' Electric Company. Singerly v. Thayer, 108 Pa. 291, 2 Atl. 230, 56 Am. Rep. 207. No matter how unsatisfactory the motor might actually be, it must be held to be entirely satisfactory if the bankrupt so determined; and, if the bankrupt chose to fulfill the condition of sale as set forth in the agreement, the Manufacturers' Electric Company could not refuse to consummate the sale on the ground that it was not willing to sell a motor which was unsatisfactory, even though the purchaser was willing to take it. Hickman v. Shimp, 109 Pa. 16. The bankrupt agreed that, if the motor was not satisfactory, it would be returned to the company within 5 days after the expiration of the 60 days' trial. The specified time for the test having expired, the bankrupt was obliged, if it intended to return the motor, to do so within the time fixed. Mere complaint was not sufficient to relieve it. It was bound to return the motor in accordance with the agreement, or else must be presumed to have intended to keep it and convert the contract into one of sale. Butler v. School District, 149 Pa. 351, 24 Atl. 308. The testimony in this case shows that the motor was never returned to the Manufacturers' Electric Company. The bankrupt, therefore, having failed to return the motor within 5 days after expiration of the 60 days' trial, in accordance with clause 5, became bound by its agreement, under clause 4, to pay for the motor the sum of $548.95 within 30 days after the expiration of the 60 days' trial. The words "within 30 days after the expiration of the 60 days' trial" in clause 4 seem to refer to the time of payment, and not to the date on which the option of purchase was to be exercised; for otherwise clause 5 becomes meaningless. Under clause 5 it became the duty of the bankrupt to return the motor within 5 days after the expiration of the trial, if it was not satisfactory. If, therefore, the bankrupt is obliged to return the motor at the end of the fifth day after the trial, and at the same time is not obliged to purchase it until the thirtieth day after the trial, there is a period of 25 days which has not been provided for at all under this agreement. It seems, therefore, that, in order to give effect to both clauses of the agreement, the above interpretation must be followed, and that the option to purchase must be presumed to have been exercised on the fifth day after the trial and evidenced by the nonreturn of the motor, and that the additional 25 days were given for payment of the purchase money.

Another interpretation, however, is possible, under which clause 5 must be held to be made void by clause 4. Under clause 5, the bankrupt agreed to return the motor within 5 days after expiration of the trial. Although it failed to return the motor, it still had 25 additional days within which to exercise its option to purchase under clause 4. If it chose to purchase, it could do so only by tendering the purchase money, as under this view of the contract the payment of the purchase money was a condition precedent to

the passing of the title. It would, then, be a bailment of the possession, with an agreement for a future purchase, conditioned on the prepayment of the price (Rowe v. Sharp, 51 Pa. 26; Rose v. Story, 1 Pa. 190, 44 Am. Dec. 121), and clause 4 must be read as an agreement on the part of the bankrupt to purchase said motor by paying therefor the sum of $548.95 within 30 days after expiration of 60 days' trial. Therefore, on or before the thirtieth day after the expiration of the trial, it became the duty of the bankrupt, if it desired to keep the motor, to tender the purchase money, whereby the sale would be consummated and the title would pass. Its failure to pay the purchase money gave to the Manufacturers' Electric Company the right to demand either the return of the motor or the payment of the purchase money. It could choose to consider the transaction either a continuing bailment or a sale, but was bound by its election. In fact, however, according to the testimony, nothing was done by the Manufacturers' Electric Company, and, although the 30 days after the expiration of the trial expired on December 18, 1903, the motor continued in possession of the bankrupt, and no demand for it was made until shortly before it was advertised for sale on February 18, 1904.

Assuming that title to the motor did not pass by reason of the fact that the payment of the purchase money was a condition precedent which was not fulfilled, and that the Manufacturers' Electric Company had the right to retake its motor, the further question arises as to whether the Manufacturers' Electric Company waived its right to insist upon strict performance of the condition precedent. It became the duty of the Manufacturers' Electric Company, within a reasonable time after December 18, 1903, to demand possession of its motor, if it intended to insist upon its right of property thereto. This it failed to do. In the case of Leatherbury v. Connor, 54 N. J. Law, 172, 23 Atl. 684, 33 Am. St. Rep. 672, goods were sold and delivered on condition that a chattel mortgage should be executed by the vendee on the following Monday. The vendee failed to keep his promise, and the vendor did not insist on return of his goods, but allowed them to remain in vendee's possession. In a month the vendee became insolvent and went into a receiver's hands. The vendor replevied; but it was held that it was the vendor's duty to pursue his right to recover possession with diligence, to follow the buyer at once and not suffer his vigilance to abate. Vendor's acquiescence in possession of vendee for one month was a waiver of performance of the condition precedent and a waiver of his title to the goods. The Manufacturers' Electric Company allowed the motor to remain in the possession of the bankrupt until the petition in bankruptcy was filed, and even for more than three weeks thereafter, before it took any step to maintain its right of property. It sent a bill for the purchase price, and its agents demanded payment thereof. On January 19, 1904, it discontinued the supply of electric current for its motor, because the bills for the current used had not been paid; but it allowed the motor to remain in the possession of the bankrupt. A sale for cash is a sale on condition ("do ut des"), which may be waived by leaving the goods in vendee's possession. Bowen v. Burk, 13 Pa. 146; Backentoss v. Speicher, 31 Pa. 324.

Has the Manufacturers' Electric Company manifested an intention or willingness to waive the condition and consider the delivery unconditional and the sale absolute, without having received payment? This is a question of fact, and I find that the Manufacturers' Electric Company did nothing to maintain its title to the motor, but, on the contrary, that by its action it considered the motor sold, and that its only interest was in securing the purchase money due. Therefore I am of the opinion that, under either interpretation of the effect of clauses 4 and 5 of the contract, the title to the motor is in the bankrupt, and not in the petitioner.

I shall next consider the question of title to the 75 horse power motor. This motor was delivered to the bankrupt under a "contract and agreement" of which the following is a copy:

"The Manufacturers' Electric Company, American and Somerset Streets, Philadelphia, Pa.

"This contract and agreement, by and between the Manufacturers' Electric Company, of Philadelphia, hereinafter called 'the company,' and the Froehlich

Rubber Refining Co., hereinafter called 'the consumer,' witnesseth: That the consumer has requested the company to supply electrical current for one motor of 75 H. P., at the premises, situated 3444 Trenton avenue; and, as the said consumer has not purchased said motor, but is desirous of having the use of the same for a period of one month—

"The consumer agrees: (1) To pay the cost of hauling of the motor to his premises. (2) To pay for the erection and interior connections to said motor, to the point where the service connection will be made, and the inspection of same by the Philadelphia Fire Underwriters' Association. (3) To use the motor for the purpose above set forth, for a period of two calendar months, from October 15th, 1903. (4) To purchase said motor, paying therefor the sum of one thousand three hundred and ninety-three dollars ($1,393) on the 25th day of Dec. 1903, provided the motor proves satisfactory for the purpose contracted for. (5) To return the motor to the company in as good electrical and mechanical condition as when received on the 21st day of Dec. 1903, reasonable wear and tear excepted, provided said motor proves unsatisfactory for the purpose contracted for. (6) To pay for the use of the said motor during the two calendar months from Oct. 15th, 1903, to Dec. 15th, 1903, the sum of seventy-five dollars, and for the current consumed during said period at the regular rates of the company. These payments to be made at the office of the Manufacturers' Electric Company, on Dec. 25th, 1903.

"And the company agrees, upon the purchase of said motor, to credit the rental paid for said calendar month as part of the purchase money.

"In witness whereof, the respective parties have affixed their hands and seals this 27th day of September 1903.

"The Froehlich Rubber Refining Co.
"Jesse Froehlich, Secy.

"Witness:
  "C. J. Russell."

This motor was delivered on October 22, and started on November 10, 1903. The two months within which the motor was in possession of the bankrupt on trial expired December 15, 1903. In accordance with the terms of the contract it became the duty of the bankrupt, if the motor proved unsatisfactory, to return it on December 21st, and, if it proved satisfactory, to purchase it, paying $1,393 on December 25, 1903. The motor was never returned to the Manufacturers' Electric Company.

The records of the Manufacturers' Electric Company show that from November 10, to December 24, 1903, this motor ran 3,100 kilowatt hours, equivalent to 56 working hours, and that the charge for the current consumed was $155.62. It appears that this motor furnished power for running two rubber mixing rolls, whose total resistance was about 33 horse power; hence, as in the case of the 20 horse power motor, its use was uneconomical. It was seriously out of order at one time by reason of an accident by which the gearing was broken, but it appears that this was not the fault of the motor itself but was the result of some extraneous cause. As in the case of the 20 horse power motor, it was suggested by the agent of the Manufacturers' Electric Company that either a heavier load should be put on this motor or that it should be replaced by a smaller motor; but nothing was done as a result of this suggestion. No objection was made by the bankrupt before December 25, 1903, and thereafter the objections were in the form of complaint by two of the officers of the bankrupt corporation. The Manufacturers' Electric Company permitted the motor to remain in the possession of the bankrupt, and did nothing whatever for the purpose of maintaining their right to reclaim it. As in the case of the 20 horse power motor, Mr. Jesse Froehlich complained of its unsatisfactoriness at a meeting of the directors of the bankrupt corporation, and stated that he was going to return both motors, in order to reduce the indebtedness of the bankrupt; but no action was taken on his statement, nor were the motors returned. On or about December 29, 1903, a bill was sent to the bankrupt for the purchase price of the motor by the Manufacturers' Electric Company. The other testimony relating to this motor is practically similar to that relating to the 20 horse power motor. The value of this motor and two starting boxes is $1,000.

The conclusions of law reached by me as to the 20 horse power motor apply likewise to this motor, and, excepting the difference in dates between the two contracts, the contract under which the 75 horse power motor was delivered is the same as that under which the 20 horse-power motor was delivered. I am therefore of the opinion, for the reasons hereinbefore given, that the title to the 75 horse power motor is in the bankrupt, and not in the petitioner.

The two 5 horse power motors were delivered under a "contract and agreement" of which the following is a copy:

"The Manufacturers' Electric Company, American and Somerset Streets, Philadelphia, Pa.

"This contract and agreement, by and between the Manufacturers' Electric Company, of Philadelphia, hereinafter called 'the company,' and the Froehlich Rubber Refining Co., hereinafter called 'the consumer,' Witnesseth: That the consumer has requested the company to supply electrical current for two motors of 5 H. P. each, at the premises, situated 3444 Trenton Ave.; and, as the said consumer has not purchased said motor, but is desirous of having the use of the same for a period of one month—

"The consumer agrees: (1) To pay the cost of hauling of the motor to his premises. (2) To pay for the erection and interior connections to said motor, to the point where the service connection will be made, and the inspection of same by the Philadelphia Fire Underwriters' Association. (3) To use the motor for the purpose above set forth, for a period of two calendar months, from Dec. 17th, 1903. (4) To purchase said motor, paying therefor the sum of four hundred and ninety-two dollars ($492.00) on Feby. 22d, 1904, provided the motor proves satisfactory for the purpose contracted for. (5) To return the said motor to the company in as good electrical and mechanical condition as when received on the 22d day of Feby., 1904, reasonable wear and tear excepted, provided said motor proves unsatisfactory for the purpose contracted for. (6) To pay for the use of said motor during the two calendar months from December 17th, 1903, to Feby. 22d, 1904, the sum of ten dollars, and for the current consumed during said period at the regular rates of the Manufacturers' Electric Company, on the 22d Feby., 1904.

"And the company agrees, upon the purchase of said motor by the consumer, to credit the rental paid for said calendar month as part of the purchase money.

"In witness whereof, the respective parties have affixed their hands and seals this 19th day of Jan. 1904.

                         "Froehlich Rubber Refr. Co., per M. Froehlich.
"Witness:
        "Wm. J. Lochart."

The period of two months from December 17, 1903, within which these motors were to be used on trial by the bankrupt, would have expired on February 17, 1904. Before this date, however, and before any conclusion was reached by the Froehlich Rubber Refining Company, the petition in bankruptcy was filed against it, and the Manufacturers' Electric Company presented its petition asking for the delivery of the motors as its property. The testimony shows that these motors were not used at all by the bankrupt corporation, and that they were of the value of $206 each. In accordance with the opinion hereinbefore expressed as to the effect of the contract under which these motors were delivered, it follows that no title to the 5 horse power motors ever passed to the Froehlich Rubber Refining Company, and I therefore find that the title to these motors is in the Manufacturers' Electric Company.

The electric wiring, seven transformers, and seven electric meters claimed by the Manufacturers' Electric Company were delivered to the bankrupt under so-called power contracts (Exhibits A, C, and E), under which the bankrupt agreed that the Manufacturers' Electric Company should install its meters and that the current used should be paid for as registered for by them, and it further agreed "that the meters, transformers, and cut-outs located on the street side of the meter will remain the property of the company, and may be removed by it when service is discontinued for any reason." There was no

other testimony offered either by the claimant or the trustee in bankruptcy bearing upon the title to these articles. In view of the positive expressed agreement above quoted, it is clear that no title to the wiring, the transformers, and the meters ever passed to the bankrupt, and I therefore find that the title to these articles is in the Manufacturers' Electric Company.

And now, March 22, 1905, in accordance with the foregoing opinions and findings, it is ordered that the Manufacturers' Electric Company shall forthwith pay to the trustee in bankruptcy of the Froehlich Rubber Refining Company the sum of $1,470, being the value as found by the referee of one electric 20 horse power motor and one electric 75 horse power motor belonging to the bankrupt estate, and delivered to the Manufacturers' Electric Company in accordance with the order of the District Court made February 17, 1904. And it is furthermore ordered that the title of the Manufacturers' Electric Company to two electric 5 horse power motors, electric wiring, seven transformers, and seven electric meters be, and the same is hereby, confirmed.

Henry N. Wessel, for trustee.

R. Stuart Smith and Morgan & Lewis, for Manufacturers' Electric Company.

HOLLAND, District Judge. The question certified to the court by the referee in this case raises the question of ownership of two electric motors claimed by the Manufacturers' Electric Company from the receiver of this bankrupt. The property, by order of this court, was placed in the possession of the claimant and a bond substituted therefor. The referee finds the property, at the time the petition in bankruptcy was filed and at the time of adjudication, belonged to the bankrupt, and therefore passed to the receiver, the value of which he finds to be $1,470, and directs that this amount be paid by the claimant to the trustee for this machinery. The other machinery mentioned in the report he finds to be the property of the claimant, and affirms its possession and ownership in the same. The findings of fact by the referee are stated in detail, and we think warranted by the evidence submitted. We also agree with the referee in his conclusions of law which are fully set forth in the report.

The order of the referee, made March 22, 1905, on the claimant, to pay to the trustee $1,470, is therefore hereby affirmed.